UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,    :
                                       :
               Plaintiff,              :
                                       :
               -v-                     :      09 Civ. 6829 (JSR)
                                       :
BANK OF AMERICA CORPORATION            :
                                       :
               Defendant.              :
------------------------------------ x
------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,    :
                                       :
               Plaintiff,              :
                                       :
               -v-                     :      10 Civ. 0215 (JSR)
                                       :
BANK OF AMERICA CORPORATION            :
                                       :
               Defendant.              :
------------------------------------ x


                    OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

        The question before the Court is whether to grant the motion
of plaintiff Securities and Exchange Commission ("S.E.C."), filed on
February 4, 2010, seeking approval of a Proposed Consent Judgment that
would resolve the two above-captioned cases.  Given the somewhat
tortured background of these cases and the difficulties the motion
presents, the Court is tempted to quote the great American philosopher
Yogi Berra: "I wish I had an answer to that because I'm getting tired

of answering that question."[1]  However, after full consideration, the Court reluctantly grants the motion, on the terms specified below.

The Court begins where any court should: with the facts.  In disapproving as neither fair, reasonable, adequate nor in the public interest the prior proposed settlement of the first of these two cases, 09 Civ. 6829 (the "Undisclosed Bonuses" case), the Court bewailed the absence of established facts supporting the proposal and expressed the hope that "the truth may still emerge."  S.E.C. v. Bank of America Corp., 653 F. Supp. 2d 507, 512 (S.D.N.Y. 2009).  Since then, the parties have conducted extensive discovery, assisted by the helpful decision of defendant Bank of America Corp. (the "Bank") to waive attorney-client privilege, resulting in the S.E.C.'s presentation to this Court of a 35-page Statement of Facts and a 13-page Supplemental Statement of Facts, the accuracy of which is not contested here by the Bank.[2]  In addition, in response to questions

---

[1]  David H. Nathan, Baseball Quotations 150 (1993).  Berra, a disciple of the equally profound professor Casey Stengel, has had a notable impact on the development of American law.  See generally William D. Araiza et al., The Jurisprudence of Yogi Berra, 46 Emory L.J. 697 (1997).

[2]  At the hearing on the instant proposed settlement held before this Court on February 8, 2010, the Court asked counsel for the Bank to affirm "that you have no material quarrel with the accuracy of the facts set forth in the SEC statement of facts and that the Court can consider those statements of fact as agreed to for the purposes of evaluating the settlement," to which Bank counsel responded "That's correct, your Honor." Transcript ("tr."), 2/8/10, at 6.  The Court presumes that if the Bank felt any differently about the Supplemental Statement of

2

from the Court in an Order dated February 11, 2010, the parties have provided, and the Court has reviewed, hundreds of pages of deposition testimony and other evidentiary materials bearing on the case.

As a result of that review, it is clear to the Court that:

(1) the Proxy Statement that the Bank sent to its shareholders on November 3, 2008 soliciting their approval of the merger with Merrill Lynch & Co., Inc. ("Merrill") failed adequately to disclose the Bank's agreement to let Merrill pay its executives and certain other employees $5.8 billion in bonuses at a time when Merrill was suffering huge losses; and

(2) the Bank failed adequately to disclose to its shareholders either prior to the shareholder approval of the merger on December 5, 2008 or prior to the merger's effective date of January 1, 2009 the Bank's ever-increasing knowledge that Merrill was suffering historically great losses during the fourth quarter of 2008 (ultimately amounting to a net loss of $15.3 billion, the largest quarterly loss in the firm's history) and that Merrill had nonetheless accelerated the payment to certain executives and other employees of more than $3.6 billion in bonuses.

Despite the Bank's somewhat coy refusal to concede the materiality of these nondisclosures, it seems obvious that a prudent Bank shareholder, if informed of the aforementioned facts, would have thought twice about approving the merger or might have sought its

---

Facts, it would have so informed the Court.

renegotiation.  What is far from obvious, however, is why these
nondisclosures occurred.  The S.E.C. and the Bank have consistently
taken the position that it was, at worst, the product of negligence on
the part of the Bank, its relevant executives, and its lawyers (inside
and outside), who made the decisions (such as they were) to non-
disclose on a piecemeal basis in which inadequate data coupled with
rather narrow parsing of the disclosure issues combined to obscure the
combined impact of the information being withheld.  In particular, it
appears that the relevant decision-makers took the position that
neither the bonuses nor the mounting fourth quarter losses had to be
disclosed because the bonuses were consistent with prior years'
bonuses and the losses were uncertain and, in any case, roughly
consistent with prior quarters.  See, e.g., Statement of Facts at 15,
29; Supplemental Statement of Facts at 5-8.  Despite ever-growing
indications that the latter assumption was erroneous, see, e.g.,
Supplemental Statement of Facts at 8, the relevant decision-makers
stuck to their previous determinations so far as disclosure of the
losses was concerned and appear never to have considered at all the
impact that the accelerated payment of over $3.6 billion in bonuses
might have on a company that was verging on financial ruin.

A parallel investigation by the Attorney General of the State
of New York (conducted, perhaps ironically, by a former high-ranking
official of the S.E.C.) reached a more sinister interpretation of what
happened.  Just one day before the S.E.C. presented its proposed

4

settlement of these cases, the Attorney General brought a civil action against the Bank, its former chief executive officer Kenneth D. Lewis, and its former chief financial officer Joseph L. Price, accusing them of masterminding a massive fraud and manipulation.  Compl. ¶ 1, <u>New York v. Bank of America, et. al.</u>, filed in New York State Supreme Court on February 4, 2010.  According to the first numbered paragraph of the Complaint, not only had "Bank of America's management misled its shareholders," but in so doing they were "motivated by self-interest, greed, hubris, and a palpable sense that the normal rules of fair play did not apply to them."  Indeed, "Bank of America's management thought of itself as too big to play by the rules and, just as disturbingly, too big to tell the truth."  <u>Id.</u>

While even in an era of purple prose, such language may seem deepest violet, it is nonetheless the equivalent of alleging that the Bank and its top officers purposely defrauded their shareholders or, at the very least, acted in reckless disregard of the facts and the law -- a far more culpable state of mind than mere negligence.

As a result, the Court, in assessing the Proposed Consent Judgment, was obliged, in its view, to inquire into whether the evidence before the Attorney General was sufficiently different from that before the S.E.C. as to render unreasonable the latter's conclusions on which the proposed settlement was premised.  Although the Bank objected "to any consideration being given to allegations made in other proceedings . . . or to any other extrajudicial

materials," Letter from Bank counsel to the Court (Feb. 16, 2010), the Court regards this objection as frivolous.  While it is not this Court's role in assessing the instant motion to determine which of the competing inferences drawn by the S.E.C. and the Attorney General is correct, it is indubitably this Court's obligation to determine whether the S.E.C. has ignored evidence of intentional fraud so compelling as to cast in doubt the reasonableness of the factual assumptions on which the proposed settlement rests.  When, moreover, the seemingly contrary assertions are being made by another governmental agency that has conducted its own lengthy investigation, to fail to make a modest inquiry into the basis for those assertions would be a dereliction of this Court's duty.[3]

The Court therefore requested, and received, certain testimony obtained by the Attorney General's office bearing on certain questions the Court had previously identified as significant to evaluating whether the Bank's nondisclosures were purposely fraudulent or not. For example, the Court requested from the Attorney General, as it had

---

[3] More problematic, perhaps, was this Court's reluctant agreement to accept the Attorney General's request that its materials be reviewed only on an ex parte basis, i.e., only by the Court.  Although the Court, as stated in its Order of February 11, 2010, would have preferred that the Attorney General release these materials to the public, the Court fully understands that, on the one hand, the Attorney General has legitimate concerns about premature release of information relating to a still-ongoing investigation, while, on the other hand, the parties to the instant case have a legitimate concern that the Court's determinations be made on a record fully available for their scrutiny.  As it happens, however, the Court's conclusions set forth below render this dispute moot.

previously requested from the parties here, deposition testimony concerning the precipitous termination on December 10, 2008 of the Bank's then General Counsel, Timothy Mayopoulos.  According to the parties here, this event was the result of a last-minute decision, urged upon management by several members of the Board of Directors, to keep Brian Moynihan, now CEO of the Bank, from leaving the Bank by offering him the General Counsel position.  <u>See</u> Supplemental Statement of Facts at 11-13.  But the event is described in the Attorney General's Complaint as motivated by the discovery by Mayopoulos's immediate superior, Price, that Mayopoulos now "knew too much" about the mounting Merrill losses that the Bank was trying to keep secret.  Compl. ¶ 156.

Upon review of the underlying materials provided by the parties here and by the Attorney General, the Court concludes that none of the evidence directly contradicts the Bank's assertion that Mayopoulos' termination was unrelated to the nondisclosures or to his increasing knowledge of Merrill's losses.  This is not to say that plausible contrary inferences might not be drawn.  For example, as the Court noted at the hearing on February 8, 2010, the Bank's account does not necessarily explain why Mayopoulos, a hitherto valued employee, was asked to leave the premises immediately.  Tr., 2/8/10, at 18.  Still, the Court is fully satisfied that the view of Mayopoulos's firing advanced by the Bank is supported by substantial evidence.

It is important to emphasize, with respect not just to Mayopoulos's termination but with respect to all the events that the Attorney General interprets so very differently from the S.E.C., that the Court is not here making any determination as to which of the two competing versions of the events is the correct one (an issue not before the Court).  Rather, the Court, after a careful review of voluminous materials, determines only that the S.E.C.'s conclusion that the Bank and its officers acted negligently, rather than intentionally, in causing the nondisclosures that are the predicates to the settlement here proffered, is a reasonable conclusion, supported by substantial evidence, that a reasonable regulator could draw.  The Court will therefore proceed to evaluate the proposed settlement on the basis that the S.E.C. was acting reasonably in proposing a settlement premised on the assumption that the Bank's nondisclosures were the result of negligence.

The Court accordingly turns to the question of whether, even on that assumption, the settlement is fair, reasonable, adequate, and in the public interest.  The proposed settlement has essentially two components: a package of prophylactic measures designed to prevent such nondisclosures in the future; and a penalty provision that is supposed also to serve the purpose of partially compensating victims.

The package of prophylactic measures includes, among other items, the following:

– the Bank's engagement, in consultation with the SEC, of an independent auditor to assess over the next three years whether the Bank's accounting controls and procedures are adequate to assure proper public disclosures;

– the Bank's engagement, in consultation with the SEC, of an independent disclosure counsel to report solely to the Bank's audit committee on the adequacy of the Bank's public disclosures over the next three years;

– the Bank's engagement of an outside compensation consultant to advise a fully independent compensation committee of the Bank's board as to the terms of executive compensation over the next three years; and

– the Bank's submission of executive compensation recommendations to the shareholders, for a nonbinding vote of approval or disapproval, over the next three years.

No one can quarrel that these remedial steps are helpful, so far as they go, and may help to render less likely the kind of piecemeal and mincing approach to public disclosure that led to the Bank's problems in the instant cases.  Given that the apparent working assumption of the Bank's decision-makers and lawyers involved in the underlying events at issue here was not to disclose information if a rationale could be found for not doing so, the proposed remedial steps should help foster a healthier attitude of "when in doubt, disclose."

In order to further strengthen these prophylactic measures, the Court suggested at the hearing on February 8, 2010 that the independent auditor and the disclosure counsel not just be chosen in consultation with the S.E.C., but rather be fully acceptable to the S.E.C., with the Court having the final say if the two sides could not agree on the selections.   The parties, by letters dated February 16, 2010, have subsequently agreed to these suggestions, which will therefore need to be incorporated in a revised Proposed Consent Judgment to be presented to the Court, as detailed below.

The Court also suggested that the compensation consultant, which the present proposal provides will be chosen solely by the Bank's compensation committee (not even in consultation with the S.E.C.), be chosen jointly by the compensation committee, the S.E.C., and the Court.  The reason for this suggestion was the Court's perception that too many compensation consultants have a skewed focus when it comes to executive compensation, concentrating on what they perceive is necessary to attract and keep "talent" (however defined), and more generally favoring ever larger compensation packages, while rarely taking account of limits that a reasonable shareholder might place on such expenditures.  In its letter of February 16, 2010, however, the Bank rejects this proposal outright, noting in its letter that the "SEC has consistently stated that it does not seek to enforce any particular philosophy or impose any substantive judgments on the form or amount of compensation."  But the Bank's strong defense of the

10

sacred cow of executive compensation is besides the point: the Court only suggested that giving the S.E.C. and/or the Court some role in the selection of the compensation consultant might provide a modicum of objectivity in that selection.  Nonetheless, the Court does agree that the manner of selection of the compensation consultant is sufficiently peripheral to the main concerns of these cases as not to constitute a "dealbreaker," particularly in light of the requirement of a nonbinding shareholder vote on compensation for the next three years.

The part of the proposed settlement that presents the greatest difficulty is, however, the penalty package, which essentially consists of a $150 million fine.  Though that amount is considerably greater than the $33 million that the Court rejected in the prior proposed settlement of the Undisclosed Bonuses case, it is still very modest in light of the fact that it now covers both cases -- that is, all the nondisclosures that were material to the proposed merger with Merrill, a merger that may yet turn out well but that could have been a Bank-destroying disaster if the U.S. taxpayer had not saved the day. From this perspective, the amount of the fine appears paltry.

An even more fundamental problem, however, is that a fine assessed against the Bank, taken by itself, penalizes the shareholders for what was, in effect if not in intent, a fraud by management on the shareholders.  This was among the major reasons the Court rejected the earlier proposed settlement.  See S.E.C. v. Bank of America Corp., 653

F. Supp. at 509.  Where management deceives its own shareholders, a fine most directly serves its deterrent purposes if it is assessed against the persons responsible for the deception.  If such persons acted out of negligence, rather than bad faith, that should be a mitigating factor, but not a reason to have the shareholder victims pay the fine instead.

Although the pending complaint of the New York Attorney General against the top two Bank officials allegedly responsible for the deceptions may, if proven in court, partially serve this deterrent purpose, it is not part of the settlement pending before this Court and may have its own evidentiary weaknesses.  The parties to the instant cases, however, attempt to mitigate the Court's concerns by proposing that, pursuant to the "Fair Fund" provisions of the Sarbanes-Oxley Act, the $150 million be distributed solely to Bank shareholders who were harmed by the Bank's nondisclosures (Bank "legacy" shareholders) and not to former Merrill shareholders who now own Bank stock (Merrill "legacy" shareholders), nor to Bank officers or directors who had access to the undisclosed information.  Although this proposal was not specifically incorporated into the Proposed Consent Judgment presented to the Court, the parties subsequently agreed to the Court's proposal that it be incorporated, and thus any revised Proposed Consent Judgment to be presented to the Court must include such terms.

What the proposal does, in effect, is to transfer $150 million from all shareholders to those current Bank shareholders who were victimized by the non-disclosures.  Since the S.E.C. in its letter dated February 16, 2010 estimates that this latter group is roughly around 50 percent of all current Bank shareholders, the effect is to transfer $75 million from Merrill "legacy" shareholders to Bank "legacy" shareholders.  Put another way, it serves to renegotiate the price that Bank shareholders would have paid to Merrill shareholders for purchasing Merrill shares if the disclosures had been made.

But the effect is very modest, amounting perhaps to no more than a few pennies per share.  Moreover, while the "legacy" Merrill shareholders may have received something of a windfall as a result of the nondisclosures, they were not responsible for those nondisclosures.  Rather, the responsibility was that of the Bank's executives, who, although barred from receiving any part of the $150 million fine, are not contributing to its payment in any material respect.

In short, the proposed settlement, while considerably improved over the vacuous proposal made last August in connection with the Undisclosed Bonuses case, is far from ideal.  Its greatest virtue is that it is premised on a much better developed statement of the underlying facts and inferences drawn therefrom, which, while disputed by the Attorney General in another forum, have been carefully scrutinized by the Court here and found not to be irrational.  Its

greatest defect it that it advocates very modest punitive,
compensatory, and remedial measures that are neither directed at the
specific individuals responsible for the nondisclosures nor appear
likely to have more than a very modest impact on corporate practices
or victim compensation.  While better than nothing, this is half-baked
justice at best.

So should the Court approve the proposed settlement as being
fair, reasonable, adequate, and in the public interest?  If the Court
were deciding that question solely on the merits -- de novo, as the
lawyers say -- the Court would reject the settlement as inadequate and
misguided.  But as both parties never hesitate to remind the Court,
the law requires the Court to give substantial deference to the S.E.C.
as the regulatory body having primary responsibility for policing the
securities markets, especially with respect to matters of
transparency.  While such deference can never be absolute -- since the
Judgment ultimately entered is the Court's and is enforced by the
Court's contempt power -- the Court would fail in its duty if it did
not give considerable weight to the S.E.C.'s position.

Even more weighty, however, in this Court's view, are
considerations of judicial restraint.  This Court, it may be obvious,
does not abdicate its role of seeking to plumb the depths of any
proposal presented for its approval.  But the considerable power given
federal judges to assure compliance with the law should never be
confused with any power to impose their own preferences.  We can balk

14

when a bank tries to escape the implications of hiding material information from its shareholders, and we can protest when the regulatory agency in charge of deterring such misconduct seems content with modest and misdirected sanctions; but, in the words of a great former Justice of the Supreme Court, Harlan Fiske Stone, "the only check upon our own exercise of power is our own sense of self-restraint." United States v. Butler, 297 U.S. 1, 79 (1936).  In the exercise of that self-restraint, this Court, while shaking its head, grants the S.E.C.'s motion and approves the proposed Consent Judgment provided that, by no later than this Thursday, February 25, 2010, the parties present the Court with a proposed Consent Judgment that includes the revised provisions to which they have consented, as set forth above.

        SO ORDERED.

                                          _____
                                        JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
       February 22, 2010